1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

GLENN KONVOLINKA,                        CASE NO. 1:04-cv-6467 OWW TAG

           Plaintiff,

           vs.                           REPORT AND RECOMMENDATION
                                         ON PLAINTIFF'S APPEAL FROM
                                         ADMINISTRATIVE DECISION

MICHAEL J. ASTRUE,
Commissioner of Social Security,

           Defendant.[1]

_____/

    Claimant Glenn Konvolinka ("Claimant") seeks judicial review of an administrative

decision denying his claim for disability insurance benefits ("DIB") under Title II of the Social

Security Act ("the Act"), 42 U.S.C. § 401 et seq.[2]  Pending before the Court is Claimant's appeal

from the administrative decision of the Commissioner of Social Security ("Commissioner").

Claimant filed his complaint on October 27, 2004, and his opening brief on August 4, 2005.

(Docs. 1, 15).  On August 11, 2005, this Court ordered the Claimant to file an amended opening

brief because his original brief did not comply with the requirements set forth in the Court's

scheduling order.  (Doc. 16).  Claimant filed a new opening brief on September 9, 2005.  (Doc.

_____

    [1] Michael J. Astrue is substituted for his predecessor, Jo Anne B. Barnhart, as Commissioner of the Social
Security Administration.  42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d)(1).

    [2] Claimant's opening brief erroneously states that, in the instant case, he filed an application for
supplemental security income benefits under Title XVI of the Act, 42 U.S.C. § 1381 et seq., which application the
Commissioner denied.  (Doc. 17, p. 1-2).  Claimant, however, did not apply for Title XVI benefits.  (See
Administrative Record ("AR") 38, 49).  In addition to Title II benefits, 42 U.S.C. § 401 et seq., Claimant applied for
benefits under Part A of Title XVIII of the Act, 42 U.S.C. § 1395(c) et seq.  (AR 49).  Title XVIII, Part A,  provides
for hospital coverage for those entitled to disability or old-age benefits under the Act.  42 U.S.C. § 1395(c) et seq.

1

17).  The Commissioner filed an opposition to the appeal on November 14, 2005.  (Doc. 19).
Claimant did not file a reply brief.

## JURISDICTION

On July 24, 2002, Claimant filed an application for DIB, alleging an onset date of
September 5, 2001.  (Administrative Record ("AR") 49-51, 55).  The application was denied
initially and on reconsideration. (AR 28-31, 34-37).

After timely requesting a hearing, Claimant and his counsel appeared before
Administrative Law Judge ("ALJ") James N. Baker on October 16, 2003.  (AR 38, 278-97).  On
February 20, 2004, the ALJ issued a written decision finding that Claimant was not disabled.
(AR 17-23).  The Appeals Council denied Claimant's request for review on August 30, 2004.
(AR 6-9).  The Appeals Council's decision, therefore, became the final decision of the
Commissioner, which is appealable to the district court pursuant to 42 U.S.C. § 405(g).  The
initiation of an appeal in the district court must be commenced within sixty (60) days of the
Appeal Council's decision.  42 U.S.C. § 405(g).  On October 27, 2004, Claimant timely filed this
action.  (Doc. 1).

## STATEMENT OF FACTS

In his July 2002 application for DIB, Claimant alleged that he was disabled due to
(1) pain in his back and right knee, (2) tingling in his feet and upper extremities, (3) numbness in,
and the inability to grip using, his hands and fingers, (4) muscle spasms; and (5) difficulties
walking, bending, lifting, and moving his neck.  (AR 55).  At the October 16, 2003,
administrative hearing, Claimant testified that he was born on December 29, 1950, making him
53 years old.  (AR 282).  He further stated that he had completed ten years of school and had
never obtained a GED.  (AR 282)

Regarding his work history, Claimant stated that he last worked in September 2001 as a
chimney sweep, a job he had performed since 1993.  (AR 282-83).  Claimant added that he had
worked as a caretaker at a ranch, an assembly worker, a janitor, and a security guard for various
periods of time, primarily during the summer, while he was a chimney sweep.  (AR 283, 289-93).
From 1990 to 1993, Claimant testified that he worked, for short periods of time, as a gas station

attendant, a road laborer, and on a garbage truck.  (AR 283).  Claimant stated that he stopped

working in 2001 when he started experiencing pain in his back, shoulder and right collar bone.

(AR 284-85).  In response to the ALJ's question, he responded that he currently had pain in his

right ankle, both sides of his neck, his middle and low neck, his right hip, his right knee where he

previously had surgery, and periodic flashes of pain in his left knee.  (AR 285).  Claimant

testified that he also experienced swelling, cramping, and difficulty opening and closing his

hands, especially in the morning.  (AR 285).  He added that he occasionally had problems

holding onto things.  (AR 285).

To help with his various pains, Claimant stated that he takes hot baths, puts a compress

on his knee or ankle, uses a heating pad, and frequently sits on a seat that provides vibration and

heat.  (AR 287).  In addition, Claimant lays down on a couch with his legs raised for five or six

hours daily, with occasional interruptions, while he watches television.  (AR 287).  Claimant also

testified that he takes pain medications that helps a little.  (AR 287).  Claimant acknowledged

that he refused to undergo surgery when he was told that it was unlikely to relieve his pain.

(AR 288-89).

As to his exertional capacity, Claimant testified that he can walk for only 25 to 30 yards

without ankle pain and back spasms, that he can stand for 30 minutes at the most, and can sit for

only 30 to 45 minutes "at the most."  (AR 286-67).

Regarding his daily life activities, Claimant testified that lives in a house with his wife

and 12-year-old son, and that he generally stays at home, wanders around and waters the yard,

occasionally washes the dishes, and drives one mile to visit a friend.  (AR 285-86).  Claimant

added that he drove a maximum of 15 miles weekly to visit his wife at work and his friends,

although he drives further if he had doctor's appointments.  (AR 288).

The ALJ next questioned Vocational Expert ("VE") Stephen Schmidt.  (AR 289).  The

ALJ asked the VE if an individual who could lift twenty pounds occasionally, ten pounds

frequently, stand/walk/sit about six hours out of an eight-hour day, occasionally push/pull with

the left upper extremity, could not climb ladders/ropes, or scaffolds, could occasionally balance

and crawl and only occasionally engage in overhead lifting, reaching, firm gripping, grasping and

1    "torking" with the upper left extremity would be able to work at a job.  (AR 294).  The VE

2    responded that an individual with those limitations could work in light exertional jobs, such as

3    cashiering or assembly work.  (AR 294-95).  The ALJ posed the same question, with more

4    stringent limitations, to the VE, and the VE responded that, even with the exacerbated

5    limitations, the Claimant could work as a cashier, but if he had problems dealing with the public,

6    he would not be able to be a cashier.  (AR 295-96).

7                                    **Claimant's Medical Records**

8           According to Claimant's medical records, Claimant's treating physicians included Dr.

9    Steven E. Shield, staff doctors affiliated with Veterans Hospitals (the "VA doctors"), family

10   nurse practitioner Steve Acuna ("FNP Acuna"), ostensibly overseen by Dr. Frank Alvarado, and

11   various specialists to whom Claimant was referred.  (See generally AR 131-277).

12          On July 23, 2001, Claimant saw Dr. Shield, complaining of chronic spinal problems with

13   worsening pain in neck, back, buttock, and toes.  Dr. Shield noted that Claimant had low back

14   pain, which an undated previous epidural steroid had not alleviated.  Dr. Shield prescribed

15   Celebrex and Ultram and scheduled a consultation with Dr. Barbara L. Bammann.  (AR 135).

16   Claimant's  consultation with Dr. Bammann, the medical director of rehabilitation services at

17   Sonora Community Hospital ("Sonora"), proceeded on September 18, 2001.  (AR 104-106).  Dr.

18   Bammann examined him and concluded that he suffered from lumbar degenerative disc disease

19   and some right piriformis syndrome.  (AR 106).  She recommended that Claimant have a

20   cortisone injection and participate in physical therapy, both of which he refused because (1) he

21   disliked needles and cortisone and (2) his busy work schedule prevented him from attending

22   therapy.  (AR 106).

23          Claimant again saw Dr. Shield on December 10, 2001, after he had injured his right ankle

24   while intoxicated.  (AR 134).  X-rays of the ankle revealed that there was no fracture. (AR

25   140-41).  Claimant returned to Dr. Shield on June 20, 2002, complaining that his right ankle and

26   foot pain had returned.  Claimant declined to undergo the recommended bone scan to evaluate

27   his ankle.  (AR 133).  On December 4, 2002, Claimant complained to FNP Acuna of continued

28   right ankle pain and instability, who recommended he wear a brace and ordered additional x-rays.

1   (AR 145).  The December 5, 2002, x-rays indicated degenerative disease of the right ankle with

2   no evidence of instability.  (AR 138).

3        On April 2, 2002, Claimant saw FNP Acuna, complaining of chronic cervical pain and

4   reporting that he had been told that he had nerve damage in his neck.  FNP Acuna diagnosed

5   cervical spine pain with left arm radiculopathy and prescribed Relafan (a non-steroidal anti-

6   inflammatory) and hydrocodone (narcotic analgesic used for moderate pain).  (AR 147).  During

7   Claimant's April 16 follow-up appointment, he complained of worsening symptoms, including

8   muscle spasms.  FNP Acuna recommended that he undergo neurological testing with Dr. Van

9   Fossen.  (AR 146).

10       On April 19, 2002, Claimant saw Donald Van Fossan, M.D., for paresthesias and

11  dysesthesias of his left upper extremity.  (AR 111-12).   Dr. Van Fossan noted upon examination

12  that Claimant had a normal gait, but had radicular symptoms in his left upper extremity down to

13  his hand, decreased pinprick sensation in 2 fingers, slight weakness in his left triceps and wrist

14  without atrophy, and no other deficits.  (Id.).  He recommended an MRI of Claimant's cervical

15  spine, which revealed C7 radiculopathy on the left secondary to C6-7 disc protrusion and

16  neuroforaminal stenosis.  Dr. Van Fossan prescribed a one-week trial of oral steroids.  (AR 110).

17       Claimant returned to Dr. Van Fossan for a follow-up appointment on May 15, 2002,

18  reporting that he felt symptom-free after taking the oral steroids, but that the pain returned after

19  he began working.  (AR 109).  Dr. Van Fossan suggested one more course of steroids, but

20  advised Claimant to take it easy over the next few weeks. (Id.).  On July 3, 2002, Claimant

21  advised Dr. Van Fossan that he had received some benefit from the second course of oral

22  steroids, but the pain and numbness had returned.  (AR 108).  Dr. Van Fossan informed Claimant

23  that his options were to live with the symptoms or undergo surgery.  Claimant stated that he

24  wanted time to consider the options.  (AR 108).

25       In December 2002, Claimant saw FNP Acuna, complaining of persistent, worsening

26  osteoarthritis in his neck and shoulders and general pain.  He reported that he had decided to

27  defer surgery.  He added that he presently was not taking any medications.  FNP Acuna

28  prescribed Arthrotec (a non-steroidal anti-inflammatory drug) and Darvocet (a narcotic analgesic

for mild to moderate pain).  (AR 145).  During a follow-up visit two weeks later, Claimant

reported that the medications decreased the pain and swelling, but that he had increasing

problems with his right clavicle, which had been injured several years earlier.  (AR 143).  FNP

Acuna diagnosed osteoarthritis and subluxation of the clavicle, told Claimant to continue his

medications, and ordered x-rays, which indicated a normal right clavicle.  (AR 143, 244).

On January 29, 2003, Claimant saw orthopaedist Steven H. Peterson, M.D. at FNP

Acuna's recommendation.  (AR 167).  Dr. Peterson took x-rays of the right clavicle and ordered

a CT scan of the right sternoclavicular joint.  The x-rays revealed no lytic or inflammatory

changes and no joint space narrowing.  (Id.).  The CT scan indicated advanced degenerative joint

disease, for which Dr. Peterson recommended an injection of local anesthesia into the right

sternoclavicular joint.  Claimant, however, stated that he wanted to defer the treatment until he

took care of his other health problems.  (AR 165).

On February 3, 2003, Claimant sought treatment from the Veterans Affairs ("VA").

(AR 153-56).  He complained of sharp, stabbing, and burning pains in his right buttocks and

thigh, worsening  anxiety, and generalized achiness and joint discomfort involving the right

ankle, shoulder, neck, and low back.  The VA doctor diagnosed sciatica, for which a prednisone

taper was ordered with instructions to follow up with the orthopedist, and depression with a

referral to the mental health center for evaluation.  (AR 153).  X-rays of the cervical and lumbar

spine revealed arthritic changes, with an overall impression of disk space narrowing with changes

of lower lumbar facet joints that could be a manifestation of acquired spinal stenosis.

(AR 155-56).

Claimant next saw FNP Acuna for his low back pain and muscle spasms on June 23,

2003.  FNP Acuna's examination indicated a negative straight leg raise in Claimant's left leg,

tenderness in his lower back, and a limited range of motion.  He prescribed diazepam for the

muscle spasms and ordered tests, which showed a negative rheumatoid factor.  (AR 241-42).

During a September 3, 2003, appointment, Claimant complained that his arthritis and arthralgia

was worse in his low back, hands, and elbows, adding that he was developing severe right

shoulder pain and worsening range of motion.  FNP Acuna noted that Claimant suffered wrist

pain and swelling, pain at the lumbar spine upon palpitation, very limited range of motion in his right shoulder with grinding and popping, and no neurovascular deficits in his right hand. FNP Acuna's assessment was that Claimant suffered from arthralgia with right shoulder pain, directed Claimant to continue taking Darvocet and diazepam, ordered x-rays of the right shoulder, and arranged for a follow-up visit in two weeks. (AR 239). The x-rays revealed mild degenerative disease of the right acromioclavicular ("AC") joint but no soft tissue abnormalities. (AR 240).

Claimant provided additional medical records to the Appeals Council. (See generally AR 265-77). The supplemental records reported that, in January 2004, Claimant started taking Zoloft for his anxiety and depression, which FNP Acuna prescribed, but refused counseling. FNP Acuna suggested that Claimant perform home exercises and stretches to alleviate his continued complaints of ankle and shoulder pain. (AR 265-66, 269-70). FNP Acuna referred Claimant to orthopedist Airell Nygaard, M.D., who concluded that Claimant had bilateral shoulder impingement syndrome secondary to Type III acromion and bilateral AC joint osteoarchrius. Dr. Nygaard recommended that Claimant undergo arthroscopic surgery. (AR 267-68).

### Residual Functional Capacity ("RFC") Assessments

On September 19, 2002, Dr. George A. Jansen, based on his review of Claimant's medical records, concluded that, physically, Claimant had a "LIGHT RFC [with] postural limitations and moderate reaching limitations." (AR 129). Dr. Jansen reported that Claimant was capable of occasionally lifting and carrying 20 pounds, frequently lifting and carrying 10 pounds, standing and/or walking 6 hours in an 8-hour day, sitting 6 hours in an 8-hour day, and could occasionally use his upper extremities to push and pull. (AR 121). He noted that Claimant's symptoms, which were attributable to medically determinable impairments, entirely precluded him climbing ladders, ropes, and scaffolds, although Claimant frequently could climb ramps and stairs, stoop, kneel, and crouch, and occasionally could balance and crawl. (AR 122, 125). Dr. Jansen added that Claimant could only occasionally perform overhead reaching, lifting, working, and grip, grasp, or torque with his left upper extremity. (AR 123). A second non-examining assessment prepared on March 27, 2003, was similar to Dr. Jansen's report with respect to Claimant's physical abilities, limitations and overall RFC. (AR 168-75).

Dr. Lakshmi Neena Madireddi, a Board-certified doctor in physical medicine and rehabilitation orthopaedics affiliated with Health Analysis Incorporated, examined Claimant on February 2, 2003, to assess his physical RFC. (AR 150-51). Dr. Madireddi's examination indicated that Claimant's cervical spine had a normal cervical curve with full range of motion in all directions except on left lateral rotation, when his range of motion decreased to 80% of normal. (AR 150). With respect to his lumbar spine, the doctor found that Claimant's forward flexion was 70% of normal, his extension was 50% of normal, and he had limited lateral rotation and bending because of his pain. Dr. Madireddi observed that Claimant had full range of motion of the shoulders and no abnormalities, tenderness, or other problems with his upper extremities, including his hands, although he reported discomfort when he raised his arms above shoulder level and a pulling sensation in his back and neck. (AR 150). The doctor further found that Claimant had full range of motion at the hips, knees, and ankles, noted that his straight leg raising was negative, and observed no abnormalities or tenderness in Claimant's lower extremities. (AR 150-51). Dr. Madireddi concluded that Claimant had chronic joint pain in his wrists, shoulder, neck, and lower back. (AR 151). The doctor's assessment was that Claimant could lift and carry 25 pounds occasionally, 10 pounds frequently, and could stand, walk, and sit 6 hours cumulatively. Dr. Madireddi stated that Claimant should avoid stooping, crouching, and crawling activities because of the pain in his spine and should not engage in repetitive pushing, pulling, or reaching activities, but placed no restrictions on Claimant's use of his hands. (AR 151).

In addition to the physical RFC assessments, the Commissioner arranged to have Dr. Gregory Fields, Ph.D, meet with and assess Claimant's mental status on May 7, 2003. (AR 179-84). Dr. Fields first interviewed Claimant, who appeared guarded but cooperative and acknowledged that he had always been tense with periodic panic-like symptoms. Claimant added that he had no homicidal or suicidal ideation. (AR 179). Dr. Fields noted that Claimant considered himself independent in the basic activities of daily living. (AR 180). Claimant scored 30 out of 30 on the Folstein Mini Mental Status Exam. (AR 180). Dr. Fields' impression of Claimant was that he suffered from an anxiety disorder, not otherwise specified, and possibly

a personality disorder, but had no formal thought disorder.  He opined that Claimant would have
no problem performing one and two-step tasks, and likely would not have difficulties with
increasingly complex multi-step and higher-level cognitive tasks.  Dr. Fields noted that
Claimant's ability to withstand the stress of the interview and test was minimally limited, and it
would appear that his ability to deal with the public, supervisors, and co-workers would be mild
to moderately limited.  (AR 181).  Dr. Fields believed that Claimant could manage routine daily
financial transactions and, overall, deemed his prognosis as guarded.  (AR 181-82).

Psychiatrist Irwin Lyons, M.D., Ph.D, a non-examining consultant, submitted a mental
RFC assessment on May 27, 2003.  (AR 185-88).  Dr. Lyons concluded that Claimant had no
significant limitations that would affect his ability to perform and sustain a job.  (AR 185-87).

On October 15 and October 17, 2003, FNP Acuna completed a questionnaire and a
medical assessment, which both he and Dr. Alvarado signed.  (See AR 245-50).  In the
questionnaire, FNP Acuna reported that Claimant's physical and mental ailments, most notably
his depression, anxiety, radiculopathy, cervical spine stenosis, and osteoarthritis, responded
poorly to treatment and precluded Claimant from performing any full-time work at any exertional
level.  (AR 245-46).  FNP Acuna's assessment stated that Claimant could occasionally (1) carry
or lift ten pounds, (2) use his hands for simple grasping and fine manipulation, (3) use his feet,
(4) climb, balance, stoop, crouch, kneel, crawl, reach, handle, feel, push and pull, and (5) could
sit with interruptions for 2 hours.  (AR 247-49).  Additional limitations included on the
assessment restricted Claimant's exposure to heights, moving machinery, extreme temperatures,
fumes, and vibrations.  (AR 250).

## STANDARD OF REVIEW

Congress has provided a limited scope of judicial review of a Commissioner's decision.
42 U.S.C. § 405(g).  A court must uphold the Commissioner's decision to deny benefits, made
through an ALJ, when the decision is based on the proper legal standards and is supported by
substantial evidence.  Webb v. Barnhart, 433 F.3d 683, 686 (9th Cir. 2005).  Substantial evidence
is more than a mere scintilla but less than a preponderance.  McAllister v. Sullivan, 888 F.2d
599, 601-602 (9th Cir. 1989) (quotations omitted).  It is "such relevant evidence as a reasonable

1   mind might accept as adequate to support a conclusion." Webb, 433 F.3d at 686, citing

2   Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).  Moreover, such

3   "inferences and conclusions as the [Commissioner] may reasonably draw from the evidence" are

4   accorded the same consideration as is substantial evidence as defined above. Mark v. Celebrezze,

5   348 F.2d 289, 293 (9th Cir. 1965).  On review, the court considers the record as a whole, not just

6   the evidence supporting the decision of the Commissioner.  Weetman v. Sullivan, 877 F.2d 20,

7   22 (9th Cir. 1989) (quotation and citation omitted).

8        It is the role of the trier of fact, not this Court, to resolve conflicts in evidence.

9   Richardson, 402 U.S. at 400, 91 S.Ct. at 1426-27.  If the evidence supports more than one

10  rational interpretation, the court must uphold the decision of the ALJ.  Allen v. Heckler, 749 F.2d

11  577, 579 (9th Cir. 1984).  Moreover, if there is substantial evidence to support the administrative

12  findings, or if there is conflicting evidence that would support a finding of either disability or

13  non-disability, the Commissioner's decision is conclusive.  Sprague v. Bowen, 812 F.2d 1226,

14  1229-1230 (9th Cir. 1987).  Nevertheless, a decision supported by substantial evidence will be

15  set aside if the proper legal standards were not applied in weighing the evidence and making the

16  decision.  Brawner v. Secretary of Health and Human Services, 839 F.2d 432, 433 (9th Cir.

17  1987).

18                        **RELEVANT LEGAL FRAMEWORK**

19       The Social Security Act defines "disability" as the "inability to engage in any substantial

20  gainful activity by reason of any medically determinable physical or mental impairment which

21  can be expected to result in death or which has lasted or can be expected to last for a continuous

22  period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Act

23  also provides that a claimant shall be determined to be under a disability only if his impairments

24  are of such severity that claimant is not only unable to do his previous work but cannot,

25  considering claimant's age, education and work experiences, engage in any other substantial

26  gainful work which exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

27  ///

28  ///

**Sequential Evaluation Process**

The Commissioner has established a five-step sequential evaluation process for determining whether a person is disabled. 20 C.F.R. §§ 404.1520, 416.920. Step one determines if he is engaged in substantial gainful activities. If he is, benefits are denied. 20 C.F.R. §§ 404.1520(b), 416.920(b). If he is not, the decision maker proceeds to step two, which determines whether claimant has a medically severe impairment or combination of impairments. 20 C.F.R. §§ 404.1520(c), 416.920(c).

If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step, which compares claimant's impairment with a number of listed impairments acknowledged by the Commissioner to be so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. § 404 Subpt. P App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one conclusively presumed to be disabling, the evaluation proceeds to the fourth step, which determines whether the impairment prevents the claimant from doing work performed in the past. If the claimant is able to perform his previous work, he is not disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant cannot perform this work, the fifth and final step in the process determines whether he is able to perform other work in the national economy in view of his age, education and work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f). See Bowen v. Yuckert, 482 U.S. 137, 107 S.Ct. 2287 (1987).

The initial burden of proof rests upon a claimant to establish a prima facie case of entitlement to disability benefits. Rhinehart v. Finch, 438 F.2d 920, 921 (9th Cir. 1971). In terms of the five-step sequential evaluation process, the Ninth Circuit has held that "[t]he burden of proof is on the claimant as to steps one to four," while at the same time noting that an ALJ's "*affirmative duty* to assist a claimant to develop the record . . . complicates the allocation of burdens" such that "the ALJ shares the burden at each step." Tackett v. Apfel, 180 F.3d 1094, 1098 & n.3 (9th Cir. 1999) (italics in original). The initial burden is met once a claimant establishes that a physical or mental impairment prevents him from engaging in his previous

occupation.  The burden then shifts to the Commissioner to show (1) that the claimant can

perform other substantial gainful activity and (2) that a "significant number of jobs exist in the

national economy" which claimant can perform.  <u>Kail v. Heckler</u>, 722 F.2d 1496, 1498 (9th Cir.

1984).

## ADMINISTRATIVE FINDINGS

The ALJ found at step one that Claimant "has not engaged in substantial gainful activity

since September 5, 2001."  (AR 22).  At step two, the ALJ determined that Claimant had severe

impairments, which included "degenerative disc disease of the cervical spine, degenerative joint

disease of the right clavicle, degenerative joint disease of the right shoulder, and

depression/anxiety."  (<u>Id.</u>).  At step three, the ALJ assessed whether Claimant's impairments

were among those acknowledged by the Commissioner to be so severe as to preclude substantial

gainful activity.  <u>See</u> 20 C.F.R. Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  The ALJ

concluded that Claimant's medically determinable impairments did not meet or equal a listed

impairment.  (AR 19, 22).  The ALJ specifically noted that he found Claimant's allegations that

he suffered intense, persistent, and limiting pain and symptoms not wholly credible given the

lack of documented records, Claimant's failure to discuss some of the ailments with his doctors,

the minimal treatment he was willing to undergo, and his refusal to try alternative treatments to

alleviate his pain, such as physical therapy and cortisone injections.  (AR 19-20, 22).

At step four, the ALJ found that the Claimant was not able to perform his past relevant

work and had no transferable work skills.  (AR 23).  At step five, the ALJ found that Claimant

had the RFC to sit, stand and walk for 6 hours in an 8-hour workday, but could only occasionally

push or pull with the upper extremities, climb ramps or stairs, stoop, crouch, or crawl, reach with

the bilateral upper extremities, engage in firm gripping, grasping, and torquing with his left upper

extremity, and could not climb ladders, ropes, or scaffolds.  (AR 22).  The ALJ also found that

Claimant could do only unskilled work.  (<u>Id.</u>).  Given an exertional capacity for light work, and

given Claimant's age, education and work experience, the ALJ noted that a conclusion of "not

disabled" would be directed under Rule 202.11 of the Medical-Vocational Guidelines ("the

Grids"), 20 C.F.R. Pt. 404, Subpt. P, App. 2.  (AR 23).  However, given the additional

1  limitations noted above, the ALJ referenced the Grids only as a framework for decision-making

2  and, using testimony by a vocational expert, found that there were a significant number of jobs in

3  the state and regional economies that Claimant could perform, such as assembly jobs (47,000

4  jobs in California and 15,000 in the region) and cashier jobs (90,000 jobs in California and

5  30,000 in the region).  (AR 21-23).  The ALJ therefore concluded that Claimant was not disabled

6  under the Act.  (AR 23).

## ISSUES

8  Claimant asserts that the Commissioner erred as a matter of law.  Claimant's broad

9  allegations contend that:

10  A.  The ALJ's RFC assessment was not supported by substantial evidence;

11  B.  The ALJ erred by finding Claimant's testimony and subjective complaints not wholly

12  credible; and,

13  C.  The ALJ erred in neglecting to provide adequate reasons for disregarding the opinion

14  of Claimant's treating physician.

15  As discussed above, this Court must uphold the Commissioner's determination that

16  claimant is not disabled if the Commissioner applied the proper legal standards and there is

17  substantial evidence in the record as a whole to support the decision.

## DISCUSSION

19  **A.    The ALJ's determination of Claimant's residual functional capacity**

20  **I.    Step two analysis**

21  Claimant's first argument on appeal is that the ALJ's step two analysis was faulty in that

22  he identified an incomplete list of "severe" impairments.  (Doc. 17, p. 4).  Claimant contends

23  that, although the ALJ identified some of Claimant's severe impairments at step two, he failed to

24  mention Claimant's: (1) lumbar disc disease, (2) pain and instability in the right knee,

25  (3) degenerative changes and instability of the right ankle, and (4) bilateral shoulder arthritis with

26  impingement syndrome.  (Id.).  The undersigned disagrees.

27  Step two of the sequential analysis is "a de minimis screening device [used] to dispose of

28  groundless claims."  Webb v. Barnhart, 433 F.3d 683, 687 (9th Cir. 2005) (brackets in original)

13

(quoting Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996)).  Here, as noted above, ALJ

Baker enabled Claimant to, in essence, *pass* the step-two screening stage by finding various

severe impairments, and to proceed to steps three and beyond.  Moreover, the ALJ clearly stated

that the list of impairments was not exhaustive, but rather that it *included* those impairments that

he identified.  As ALJ Baker wrote:

> The medical evidence establishes that the claimant has severe impairments,
> *including* degenerative disc disease of the cervical spine, degenerative joint
> disease of the right clavicle, degenerative joint disease of the right shoulder, and
> depression/anxiety, but that he does not have an impairment or combination of
> impairments listed in or medically equal to one listed in Appendix 1, Subpart P,
> Regulations No. 4.

(AR 22) (italics added).

Moreover, assuming, arguendo, that the ALJ's failure to list all of Claimant's

impairments constituted error, the error is harmless given that he nevertheless found in

Claimant's favor at step two, continued through the sequential analysis, and addressed (or

discounted) all of Claimant's alleged problems in determining his residual functional capacity.

Burch v. Barnhart, 400 F.3d 676, 682 (9th Cir. 2005).

## II.   Residual functional capacity

Claimant further asserts that ALJ Baker committed reversible error in formulating his

residual functional capacity ("RFC").  (Doc. 17, pp. 4-6).  In his RFC assessment, the ALJ stated:

> I find the claimant retains the residual functional capacity to perform the physical
> exertional and nonexertional requirements of work except for sitting, standing,
> and walking for greater than 6 hours in an 8-hour work day, more than occasional
> pushing or pulling with the upper extremities, more than occasional climbing of
> ramps or stairs, stooping, crouching, or crawling, any climbing of ladders, ropes,
> or scaffolds, more than occasional overhead reaching with the bilateral upper
> extremities, more than occasional firm gripping and grasping and torquing with
> the left upper extremity, and greater than unskilled work.

(AR 20).  Claimant contends that this assessment is faulty because the ALJ: (1) failed to include

any mental health limitations or to ensure that the mental health record was fully developed;

(2) did not find that Claimant had any reaching restrictions, contrary to the medical evidence; and

(3) stated that the upper extremity limitations pertained only to the left hand.  (Doc. 17, pp. 4-5).

As set forth below, however, the undersigned finds no error in the ALJ's RFC formulation.

///

1

### a. __Mental health limitations__

2   Claimant's first arguments regarding the RFC formulation is that the ALJ did not include

3   any mental health limitations and failed to ensure that the record with respect to Claimant's

4   mental health was fully developed.  (Doc. 17, pp. 4-5).  The undersigned disagrees.

5   An ALJ is obligated to fully develop the record even if the claimant is represented by

6   counsel.  Celaya v. Halter, 332 F.3d 1117, 1183 (9th Cir. 2003).  The claimant, however, must

7   furnish medical evidence about his alleged disabling impairments.  See 20 C.F.R  § 404.1512(a)

8   (it is claimant's obligation to furnish medical evidence about his alleged impairments); Mayes v.

9   Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001) (in response to argument that ALJ failed to

10   develop record, court noted that it was claimant's duty to prove that she was disabled and to

11   furnish medical evidence of same).

12   In the instant case, the ALJ developed the record by having Claimant, who was not

13   independently seeking treatment from a mental-health specialist, undergo a mental status exam

14   and obtained a mental-health RFC evaluation from a non-examining psychiatrist.  (See AR

15   179-88).  As reported above in the medical records and addressed by the ALJ, Dr. Gregory

16   Fields, Ph.D., performed the mental status examination and concluded that Claimant was not

17   significantly limited on a mental basis, could follow one and two-step tasks, and had only mild to

18   moderate limitation in dealing with the public, supervisors, and co-workers.  (AR 18-19, 179-82).

19   ALJ Baker also discussed the findings of non-examining psychiatrist Irwin Lyons, M.D., who

20   reported that Claimant had no significant limitations based on his mental health.  (AR 19, 185-

21   88).  Therefore, and contrary to Claimant's argument, the ALJ properly cited the very evidence

22   that formed the basis for an RFC assessment that excluded mental health related restrictions in

23   connection with unskilled work.[3]

24   ///

25

26   [3]  Claimant has not asserted that the ALJ erred in favoring Dr. Lyons's opinion over that of Gregory Fields,
Ph.D. in terms of their slightly different findings with respect to Claimant's ability to interact with the public,
27   supervisors and co-workers.  Even so, the ALJ sufficiently explained in his written determination that "[a]ny
assessment finding the claimant more limited on a mental basis is given little weight, secondary to credibility
28   problems."

**b.** **Reaching restrictions**

The second RFC-related error asserted by Claimant pertains to reaching restrictions. Specifically, Claimant avers in his brief that the ALJ "found Plaintiff had no reaching restriction," despite the examining consultant's opinion that Claimant was limited to *only occasional reaching*. (Doc. 17, p. 5) (italics added). The ALJ, however, specifically stated that Claimant could perform the exertional and nonexertional requirements of work "except for . . . more than occasional overhead reaching with the bilateral upper extremities." (AR 20, 22). Because the basis of Claimant's allegations are not supported by the record, this argument must fail.

**c.** **Hand limitations**

The final RFC-related error asserted by Claimant is that the ALJ failed to reference any limitation involving Claimant's right hand. (Doc. 17, p. 5). In the RFC determination, the ALJ explicitly found that Claimant could perform the exertional and nonexertional requirements for work "except for . . . more than occasional pushing or pulling with the upper extremities [and] more than occasional firm gripping and grasping and torquing with the left upper extremity." (AR 20, 22). The pushing or pulling restriction clearly is a bilateral limitation, which the Claimant ignored. With respect to the gripping, grasping, and torquing limitations, which the ALJ confined to Claimant's left upper extremity, the record evidence overwhelmingly supports the ALJ's finding. (See AR 121-29 and 168-75 (non-examining consultative assessments); AR 150-51 (consultative examination); AR 111-12 (examination by referred physician, Dr. Van Fossen); AR 239 (FNP Acuna's finding that Claimant had no neurovascular deficits in his right hand)). Only FNP Acuna's and Dr. Alvarado's combined questionnaire and medical assessment limited Claimant to occasional use of both his right and left hands. (AR 248-49).

Based on the foregoing, the undersigned finds that, in determining Claimant's RFC, the ALJ applied the proper legal standards and the RFC is supported by substantial evidence.

**B.** **Claimant's credibility**

Claimant asserts that the ALJ erred in discounting the credibility of his testimony at the

///

16

1   administrative hearing.  (Doc. 17, pp. 6-7).  However, the undersigned has considered ALJ

2   Baker's credibility determination and finds no error.

3        A two step analysis applies at the administrative level when considering a claimant's

4   subjective credibility.  Smolen v. Chater, 80 F.3d at 1281.  First, the claimant must produce

5   objective medical evidence of an impairment and show that the impairment could reasonably be

6   expected to produce some degree of symptom.  Id. at 1281-82.  If claimant satisfies this test –

7   and if there is no evidence of malingering – the ALJ can reject the claimant's testimony about the

8   severity of his or her symptoms "only by offering specific, clear and convincing reasons for doing

9   so."  Id. at 1281.  This level of specificity is crucial because, in its absence, effective judicial

10  review may not be possible.  See Mersman v. Halter, 161 F. Supp. 2d 1078, 1086 (N.D. Cal.

11  2001) ("The lack of specific, clear, and convincing reasons why Plaintiff's testimony is not

12  credible renders it impossible for [the] Court to determine whether the ALJ's conclusion is

13  supported by substantial evidence"); SSR 96-7p (the ALJ's decision "must be sufficiently

14  specific to make clear to the individual and to any subsequent reviewers the weight the

15  adjudicator gave to the individual's statements and reasons for that weight").

16       Here, upon first setting forth a synopsis of Claimant's medical history (AR 17-19), ALJ

17  Baker noted specific, clear and convincing reasons - supported by substantial evidence in the

18  record - for discounting Claimant's subjective complaints, and the supposed limitations that went

19  with them.  These included the following:

20       (1)  Discrepancies between Claimant's assertions and the reports of treating and

21  examining physicians.  (AR 19).  Notwithstanding the level of pain alleged by Claimant,

22  objective diagnostic reports included in the record repeatedly reveal that Claimant's degenerative

23  diseases were "mild."  (See, e.g., AR 19, 240 ("mild degenerative disease of the right

24  acromioclavicular joint"); AR 17-18, 113 ("mild cervical stenosis");   AR 18 139 ("[m]ild

25  degenerative disease"); see 20 C.F.R. § 404.1529(c)(2) ("[o]bjective medical evidence . . . is a

26  useful indicator to assist us in making reasonable conclusions about the intensity and persistence

27  of your symptoms and the effect those symptoms, such as pain, may have on your ability to

28  work"); SSR 96-7p, 1996 WL 374186, *6 (July 2, 1996) (objective medical evidence may be

used in evaluating credibility, although allegations of pain may not be disregarded solely because they are not substantiated by such evidence).

(2)  Claimant's "sporadic" treatment record, particularly after February, 2003.  (AR 19). As noted elsewhere in the ALJ's written determination, Claimant visited FNP Acuna only three times in 2003 before his administrative hearing on October 16, 2003, and the objective diagnostic tests from each such visit were largely negative.  Thus, on January 14, 2003, the impression from a radiology report was that Claimant had a "[n]ormal [right] clavicle" and that "[t]he bones, soft tissues and articulating surfaces are normal."  (AR 19, 244).  Six months later on June 23, 2003, Claimant presented to FNP Acuna with a complaint of low back pain, radicular pain and muscle spasms in his legs, whereupon a rheumatoid B panel was drawn with negative results.  (AR 19, 241-42).  Three months later, on September 3, 2003, Claimant saw FNP Acuna, complaining of right shoulder  pain.  However, an examination demonstrated "no soft tissue abnormalities" and that only "[m]ild degenerative changes are noted in the right acromioclavicular joint manifested by osteophyte formation at the joint margins.  The bones and joints are otherwise intact."  (AR 19, 239-40).[4]  See SSR 96-7p, 1996 WL 374186, *7 (July 2, 1996) ("the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints").

(3)  Claimant testified to problems "that he did not tell his doctors about" and for which there were no objective medical findings.  (AR 20).  As noted in the Statement of Facts, supra, Claimant testified that, among other things, he experienced periodic flashes of pain in his left knee and that, in the morning, his hands were swollen and difficult to open and shut.  (AR 285). Complaints about these symptoms are rarely if ever noted, however, in Claimant's reports to his various physicians.

(4)  Claimant declined injections intended to reduce his alleged lumbar pain and was "too

---

[4]  The undersigned notes - as did ALJ Baker - that Claimant also was assessed by Steven H. Peterson, M.D., on January 29, 2003, who reported x-ray results that showed "no lytic changes, inflammatory changes, joint space narrowing or elevation of the clavicle to the sternum," but who also read a follow-up CT scan  to show "[v]ery advanced degenerative joint disease RIGHT sternoclavicular joint."  (AR 18, 165-67).

busy" to attend physical therapy even though recommended by a treating physician.[5]  (AR 20).

See Smolen, 80 F.3d at 1284 (in determining the credibility of the claimant, one consideration is

his "unexplained or inadequately explained failure to seek treatment or to follow a prescribed

course of treatment"); Ruiz v. Apfel, 24 F. Supp. 2d 1045, 1049 (C.D. Cal. 1998) (ALJ properly

found that claimant's conservative treatment regimen was inconsistent with complaints of

extreme pain).  Here, as Barbara L. Bammann, M.D., reported upon seeing Claimant on

September 18, 2001:

> I offered to inject the piriformis muscle and he says that he doesn't like needles or
> cortisone, so he deferred this.  I also suggested going to physical therapy to help
> him with an exercise program of lumbar stabilization, posture and body mechanic
> training, stretching the piriformis muscle and pelvic girdle strengthening.  He says
> his work schedule is too busy and he doesn't have time to go to therapy.  (AR
> 106).

With respect to the "busy" work schedule that Claimant reported to Dr. Bammann in

September 2001 as a reason for declining physical therapy, the undersigned notes Claimant's

testimony at his administrative hearing, where he stated that he last worked in September 2001.

(AR 282-83).  Thus, it would appear that Claimant had no work schedule at all when he reported

being too "busy" to undertake physical therapy.  (AR 282-83).  See SSR 96-7p, 1996 WL

374186, *5 (July 2, 1996) ("[o]ne strong indication of the credibility of an individual's

statements is their consistency, both internally and with other information in the case record").

(5)  Claimant undertook no home exercises or other activities to ameliorate his

complaints.  (AR 20).  In fact, as noted in the Statement of Facts, supra, Claimant testified to no

such exercises, and the record reveals that his efforts - all passive - were limited to hot baths,

compresses, heating pads, vibrating seats, watching television with his legs raised for several

hours at a time, and taking small doses of mild medications.  (AR 145, 239, 287).

In light of the foregoing, the undersigned finds that ALJ Baker articulated clear grounds

for his decision to discredit Claimant's subjective complaints, and that these grounds were

supported by substantial evidence in the record.  See Light v. Social Sec. Admin., 119 F.3d 789,

---

[5] Contrary to Claimant's assertions, the medical records indicate that, sometime before July 2001, he
received epidural steroid injections.  (Doc. 17, p. 7; AR 135).  Claimant did undergo a two-week regimen or oral
steroids, which temporarily alleviated his pain.  (AR 108-10).

1  792 (9th Cir. 1997) ("the ALJ may consider [claimant's] reputation for truthfulness,

2  inconsistencies either in his testimony or between his testimony and his conduct, his daily

3  activities, his work record, and testimony from physicians and third parties concerning the nature,

4  severity, and effect of the symptoms of which he complains"); Brawner v. Sec'y of Health and

5  Human Servs., 839 F.2d 432, 433 (9th Cir. 1987) (upon giving "great weight to [the] ALJ's

6  credibility assessment," the court concluded that it was supported by substantial evidence).

7  **C.   Treating Physician Opinion**

8        Claimant asserts that the ALJ erred in discrediting the opinion of treating physician Frank

9  Alvarado, M.D.  (Doc. 6, pp. 6-7).  Dr. Alvardo had opined that Claimant could only

10  occasionally lift and carry 10 pounds, could sit for only 1 to 2 hours in an 8-hour workday, and

11  could stand and/or walk for only 1to 2 hours as well.  (AR 245-50).  Dr. Alvarado also stated that

12  Claimant's primary impairments were (1) depression, (2) anxiety, (3) upper extremity

13  radiculopathy, (4) cervical spine stenosis at C6-7 with disk bulge and bone spurs and (5)

14  osteoarthritis.  (AR 245).  However, the undersigned disagrees with Claimant and finds that ALJ

15  Baker stated proper grounds for discounting Dr. Alvarado's opinion.

16        The courts distinguish among the opinions of three types of physicians:  treating

17  physicians, physicians who examine but do not treat the claimant ("examining physicians") and

18  those who neither examine nor treat the claimant ("nonexamining physicians").  Lester v. Chater,

19  81 F.3d 821, 830 (9th Cir. 1996).  As a general rule, a treating physician's opinion is given

20  special weight because of his or her familiarity with a claimant's physical condition.  Id.; Fair v.

21  Bowen, 885 F.2d 597, 604-05 (9th Cir. 1989); see also Smolen v. Chater, 80 F. 3d 1273, 1285

22  (9th Cir. 1996) ("Because treating physicians are employed to cure and thus have a greater

23  opportunity to know and observe the patient as an individual, their opinions are given greater

24  weight than the opinions of other physicians"); SSR 96-2p, 1996 WL 374188, *1 (July 2, 1996)

25  (the opinions of a treating physician ordinarily should be given great weight).

26        Regardless of the weight given to a treating physician's medical opinion, it is not binding

27  on the ALJ with respect to the ultimate determination of disability.  See Batson v. Comm'r of

28  Soc. Sec. Admin., 359 F.3d 1190, 1194-95 (9th Cir. 2004) (treating physician had opined that

claimant "met or equaled the criteria" for a listed impairment under 20 C.F.R. § 404 Subpt. P

App. 1, § 105C); Magallanes v. Bowen, 881 F. 2d 747, 751 (9th Cir. 1989) ("treating physician's

opinion is not, however, necessarily conclusive as to either a physical condition or the ultimate

issue of disability").   Accordingly, although entitled to great weight, a treating physician's

opinion is not conclusive and may be rejected by the ALJ under appropriate circumstances.

Where a treating physician's opinion is not contradicted by another physician, it may be rejected

by the ALJ only for "clear and convincing" reasons supported by substantial evidence in the

record. Reddick v. Chater, 157 F.3d 715, 725 (9th Cir. 1998) (citation omitted).   Where a

treating physician's opinion is contradicted by another physician, the ALJ may reject the treating

physician's opinion only by providing "'specific and legitimate reasons' supported by substantial

evidence in the record for so doing." Id. (citation omitted).   The same test applies to examining

physicians: the ALJ must give clear and convincing reasons for rejecting uncontradicted

opinions, or "specific and legitimate reasons supported by substantial evidence in the record" for

rejecting those opinions that have been contradicted.   Lester v. Charter, 81 F.3d 821, 830-31 (9th

Cir. 1995).

  Courts within the Ninth Circuit have recognized various reasons deemed sufficient for the

ALJ to disregard a treating or examining physician's opinion.  These reasons include: conflicting

medical evidence, the absence of regular medical treatment during the alleged period of

disability, and the lack of medical support for physicians' reports that are based substantially on

the claimant's subjective complaints of pain.  Flaten v. Sec'y of Health & Human Svcs., 44 F.3d

at 1453, 1463-64; Fair, 885 F.2d at 604.   The ALJ also may disregard a physician's opinion that

is "brief and conclusionary in form with little in the way of clinical findings to support [its]

conclusion." Young v. Heckler, 803 F.2d 963, 968 (9th Cir. 1986) (brackets added).  In contrast,

vague, broad, or generalized reasons are insufficient grounds for the ALJ to reject a treating

physician's opinion.  McAllister v. Sullivan, 888 F.2d 599, 602 (9th Cir. 1989).

  Here, ALJ Baker wrote the following in connection with Dr. Alvardo's assessment:

> [Claimant's] treating physician also reported pain in addition to anxiety and
> depression.  This source is not a psychiatrist or psychologist.  In addition, there
> are credibility problems with regard to any assessment relying on pain and/or

mental limitations.  Therefore, little weight is given to the assessment in Exhibit 19F.  Moreover, laboratory testing was negative (Exhibits 18F, p. 5, and 8F, p. 3) .
. . . The weight of the medical record establishes that claimant is capable of performing unskilled work (SSR 85-15).  (AR 20).

It is evident from the above that the ALJ cited specific and legitimate reasons for discounting Dr. Alvarado's opinion.  The first of these - with respect to Claimant's depression and anxiety - was that Dr. Alvarado was neither a psychiatrist nor a psychologist (and, in fact, had limited his treatment to prescribing low doses of Valium to alleviate Claimant's muscle spasms and anxiety).  (AR 20).  In this regard, Social Security regulations explicitly state that greater weight is given to specialists than to non-specialist sources.  20 C.F.R. § 404.1527(d)(5) ("[w]e generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist").  In the instant case, there was an examining mental health specialist, Gregory Fields, Ph.D., who reported (as the ALJ noted) that Claimant was not significantly limited on a mental health basis.  (AR 18, 179-82).  Similar conclusions were reached by non-examining state agency medical consultant Irwin Lyons, M.D., Ph.D., also as reported by the ALJ.  (AR 19, 185-87, 192-205).

A second reason for ALJ Baker's determination with respect to Dr. Alvarado was that his assessment relied on Claimant's self-reported pain-related complaints.  (AR 20).  Having found that Claimant himself was not credible, the ALJ correctly concluded that a medical opinion based, in part, on Claimant's statements could not be trusted.  See Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997) (physician's report based on exaggerated self-reported complaints was properly discounted).

A third reason that the ALJ discounted Dr. Alvarado's opinion was that it was inconsistent with laboratory tests.  (AR 20).  Various such diagnostic tests were cited by the ALJ throughout his written determination.  Among these were tests showing negative rheumatoid and ANA factors (AR 20, 144, 242), x-rays of Claimant's right shoulder on January 14, 2003 that were found to be "normal" (AR 19, 244), x-rays on September 4, 2003, that showed only mild degenerative disease of the right ACM joint (AR 19, 240), and similar x-ray reports with respect to Claimant's right ankle and cervical spine.  (AR 18, 138-39).

1    A fourth and final reason for ALJ Baker's rejection of the work-related limitations noted

2  by Dr. Alvarado was that it was against the "weight of the medical record [which] establishes

3  that claimant is capable of performing unskilled work." (AR 20). Indeed, as noted elsewhere in

4  the ALJ's written determination, examining and non-examining medical professionals had

5  concluded that Claimant was capable of performing a range of work activities. Consultative

6  orthopedic examiner Lakshmi Neena Madiereddi, M.D., opined, after an examination of

7  Claimant on December 18, 2002, that he was capable of lifting and carrying 25 pounds

8  occasionally and 10 pounds frequently, could stand and walk up to 6 hours cumulatively and

9  could sit 6 hours cumulatively. (AR 18, 150-51). Likewise, a state agency non-examining

10  physician opined on March 23, 2003, that Claimant could perform a range of light work. (AR

11  18, 169-75).

12    In sum, the Court finds that ALJ Baker properly set forth both specific and legitimate

13  reasons for discounting the opinion of Dr. Alvarado and that there was, therefore, no error.

14                    <u>**CONCLUSION AND RECOMMENDATION**</u>

15    For the reasons discussed above, this Court finds no error in the ALJ's analysis and that

16  the ALJ properly concluded Claimant is not disabled. This Court further finds the ALJ's

17  decision is supported by substantial evidence in the record as a whole and based on proper legal

18  standards. Accordingly, this Court RECOMMENDS:

19    1.    That Claimant's Social Security complaint be DENIED; and

20    2.    That Judgment be ENTERED for Defendant Michael J. Astrue and against

21  Claimant Glenn Konvolinka.

22    This Report and Recommendation is submitted to the District Judge assigned to this

23  action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72-304. No later than

24  ten (10) <u>court</u> days after service of this Report and Recommendation, any party may file written

25  objections to this Report and Recommendation with the Court and serve a copy on all parties and

26  the Magistrate Judge and otherwise in compliance with this Court's Local Rule 72-304(b). Such

27  a document should be captioned "Objections to Magistrate Judge's Report and

28  Recommendation." Responses to objections shall be filed and served no later than ten (10) <u>court</u>

days after service of the objections and otherwise in compliance with this Court's Local Rule 72-304(d).  A copy of the responses shall be served on the Magistrate Judge.  The District Judge will review the Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Judge's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

Dated:   **February 16, 2007**                                           _____**/s/ Theresa A. Goldner**_____
**j6eb3d**                                                                    UNITED STATES MAGISTRATE JUDGE